1

2

3    **E-FILED on** ___3/30/07___

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9          FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                      SAN JOSE DIVISION

11

12   ARMANDO AND ALINDA MARTINEZ, on          No. C-06-03327 RMW
     behalf of themselves and a class of others
13   similarly situated,                       ORDER GRANTING MOTION TO DISMISS
                                                COUNTS TWO THROUGH SIX OF FIRST
14              Plaintiffs,                     AMENDED COMPLAINT

15        v.                                    **[Re Docket No. 27]**

16   WELLS FARGO BANK, N.A.; WELLS
     FARGO HOME MORTGAGE, INC.; WELLS
17   FARGO FINANCIAL SERVICES, INC.; and
     WELLS FARGO REAL ESTATE TAX
18   SERVICES, LLC,

19              Defendants.

20

21

22        Defendants Wells Fargo Bank, N.A., Wells Fargo Home Mortgage, Inc., Wells Fargo

23   Financial Services, Inc., and Wells Fargo Real Estate Tax Services, LLC (collectively, "Wells")

24   move to dismiss counts two through six of plaintiffs' first amended complaint ("FAC") for failure to

25   state a claim.  Plaintiffs Armando and Alinda Martinez (together, the "Martinez's") purport to bring

26   this action on behalf of themselves and a class of similarly situated individuals.[1]  Plaintiffs oppose

27   _____

28   [1]     The court notes that no class has been certified under Fed. R. Civ. P. 23 in this action.

1   the motion.  The court has read the moving and responding papers and considered the arguments of

2   counsel.  For the reasons set forth below, the court GRANTS defendants' motion to dismiss.

3   Plaintiffs have twenty days from the date of this order to amend their complaint, except as to count

4   two, which is dismissed with prejudice.

## I. BACKGROUND

6          The Martinez's allege that they are home mortgage borrowers from whom Wells wrongfully

7   charged and collected "unearned fees" for settlement services related to the refinancing of their

8   home mortgage in May of 2005.  FAC ¶ 3.  Wells is a financial services company that provides,

9   *inter alia*, settlement services in connection with residential mortgage loans.  *Id.* ¶ 9.  According to

10  the complaint, Wells "requires its borrowers to pay the cost of automatic underwriting, tax services,

11  and related closing costs" as a condition to obtaining a loan by stating in its Commitment Letter:

12  "You are responsible for payment of all closing costs incurred in this loan transaction.  In no event

13  will the Lender be responsible for any closing costs."  *Id.* ¶ 15.

14         Plaintiffs allege that Wells improperly charged them unearned fees for settlement services

15  including fees for underwriting services, tax services and other similar fees.  *Id.* ¶ 29.  In particular,

16  plaintiffs allege that Wells's initial good faith estimate of closing costs provided an estimated

17  underwriting fee of $350.  *Id.*  After the underwriting was completed Wells charged plaintiffs $800

18  for the underwriting service.  *Id.*  According to the complaint, the underwriter received the loan file

19  and completed the underwriting one hour and four minutes later.  *Id.*  Plaintiffs allege that Wells

20  utilized, Wells Fargo Real Estate Tax Services, LLC ("WFRETS"), a related entity, to provide tax

21  services for which plaintiffs were charged $75 by Wells.  *Id.*  Plaintiffs allege that they are informed

22  and believe that WFRETS charged Wells less than $75 for such tax service.  *Id.*

23         Plaintiffs also seek to bring this action on behalf of themselves and a class of similarly

24  situated individuals.  Plaintiffs propose a class comprising:

25         All persons and entities who, on or after January 1, 1995, obtained one or more
           federally-related home mortgages from any of the Defendants in which (1) automated
26         underwriting was utilized with a score indicating the loan was acceptable for
           purchase by Fannie Mae or Freddie Mac, and the borrower was charged a fee for
27         underwriting, and (2) a fee was charged by the lender for a service reflected on the
           HUD-1 and someone other than that particular lender performed such service.

28

ORDER GRANTING MOTION TO DISMISS COUNTS TWO THROUGH SIX OF FIRST AMENDED COMPLAINT
No. C-06-03327 RMW
SPT                                                      2

**United States District Court**
For the Northern District of California

1   *Id.* ¶ 30.

2       Plaintiffs contend generally that Wells improperly overcharges and marks up underwriting

3   service fees.[2]  According to the complaint, Wells usually completes underwriting services in one of

4   three methods: (1) it performs the service itself and charges excessive fees; (2) it has an affiliate,

5   such as Wells Fargo Home Mortgage, Inc. ("WFHM"), perform the service and charges excessive

6   fees and/or mark ups; or (3) it has an unaffiliated third party perform the service, marks up the fee

7   without providing any additional services, and passes up the inflated fee to customers.  *Id.* ¶ 23.

8   Plaintiffs aver that Wells requires its borrowers to pay the cost of automatic underwriting, tax

9   services, and related closing costs as a condition to obtaining a loan.  *Id.* ¶ 15.

10      Beginning in 1995 the Federal Home Loan Mortgage Corporation ("Freddie Mac") and

11  Federal National Mortgage Association ("Fannie Mae") began requiring lenders who intended to sell

12  their loans to one of these agencies to use automated underwriting software.  *Id.* ¶ 18.  These

13  agencies purportedly charge $20 per loan using the automated underwriting software.  *Id.* ¶ 19.

14  Instead of passing savings to home buyers, Wells allegedly "charges hundreds of dollars for

15  underwriting services that only costs it less than $100 per loan," and pockets the savings for itself.

16  *Id.* ¶¶ 20-21.  Further, according to plaintiffs, Freddie Mac and Fannie Mae "guarantee" that they

17  will purchase on the secondary market the loans of home mortgage borrowers whose underwriting

18  score meets a certain level, thereby eliminating Wells's risk in the underwriting process.  *Id.* ¶ 18.

19      Plaintiffs also contend that Wells improperly marks up tax service fees and related closing

20  fees.  Wells allegedly utilizes either an affiliated or unaffiliated third party to provide tax service,

21  flood certification, document preparation, notary, and other similar fees, and charge plaintiffs a fee

22  that includes a "mark up" from the amount charged to defendants by the third party.  *Id.* ¶¶ 27-28.

23      Plaintiffs assert four causes of action.  In count one, plaintiffs allege that Wells violated

24  _____

25  [2]     Plaintiffs' allegations of overcharges and mark ups are similar to those made in *Kruse v.*
    *Wells Fargo Home Mortg., Inc.*, 383 F.3d 49 (2d Cir. 2004).  As used in the complaint, overcharges

26  arise out of settlement services provided by the lender itself but charged to consumers at
    substantially more than the provider's cost.  *See Kruse*, 383 F.3d at 53.  "A settlement service

27  provider 'marks up' the fee for a settlement service when the provider outsources the task of
    providing the service to a third-party vendor, pays the vendor a fee for the service, and then, without
    providing an additional service, charges homeowners seeking mortgages a higher fee for the

28  settlement service than that which the provider paid to the third-party vendor."  *Id.*

United States District Court
For the Northern District of California

1   section 8(b)(2) of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq.*,

2   and related regulations, by accepting unearned fees in the form of "mark ups" from plaintiffs for

3   settlement services, including underwriting, tax services, and related services, without providing any

4   actual, necessary, or distinct services, goods, or facilities to justify the mark up.  In count two,

5   plaintiffs allege that Wells violated section 8(b)(2) of RESPA, and related regulations, by accepting

6   unearned fees in the form of "overcharges," described as fees that exceeded the reasonable value of,

7   or which bear no reasonable relationship to, goods, facilities, or services provided.  In counts three,

8   four, and five, plaintiffs allege that Wells's alleged conduct constitutes (1) unlawful business acts

9   and practices, (2) unfair business acts and practices, and (3) fraudulent business acts and practices in

10  violation of Cal. Bus. & Prof. Code § 17200 *et seq.*  In count six, plaintiffs allege that the Deed of

11  Trust between Wells and plaintiffs represents an agreement, which Wells breached by failing to

12  comply with both RESPA and HUD regulations implementing RESPA.  The regulations were

13  purportedly incorporated into the Deed of Trust.

## II.  ANALYSIS

15       Wells moves to dismiss count two on the basis that the plain text of RESPA does not prohibit

16  overcharges.[3]  Wells moves to dismiss plaintiffs' state law claims in counts three through six on the

17  basis that they are preempted by federal law.

### A.    Legal Standard

19       A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint.

20  Dismissal can be based on the "lack of a cognizable legal theory" or "the absence of sufficient facts

21  alleged under a cognizable legal theory."  *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th

22  Cir. 1988).  When evaluating a Rule 12(b)(6) motion, the court must accept all material allegations

23  in the complaint as true and construe them in the light most favorable to the non-moving party.

24  *Barron v. Reich*, 13 F.3d 1370, 1374 (9th Cir. 1994).  A court must not dismiss a complaint for

25  failure to state a claim unless "it appears beyond doubt that the plaintiff can prove no set of facts in

27
28  [3]       Defendants note in their moving brief that they do not seek to address "mark ups" (count
one) in the present motion, but deny such allegations and intend to demonstrate that no mark ups
occurred in this case.  *See* Defs.'s Mot. Dismiss at *vi* n.2, 1:23-25.

United States District Court
For the Northern District of California

1    support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46

2    (1957); *see also United States v. Redwood City*, 640 F.2d 963, 966 (9th Cir. 1981).

3         **B.    RESPA**

4         Wells argues that plaintiffs have failed to state a violation of section 8(b) of RESPA based on

5    purported overcharges because section 8(b) only prohibits the splitting of unearned fees.  Wells's

6    argument is twofold.  First, Wells submits that the statutory language in section 8(b) is unambiguous

7    that the unearned fees need to be split between the lender and a third party in order to fall within the

8    purview of section 8(b).  Therefore, no deference need be given to the HUD policy statement that

9    interprets section 8(b) as barring unilateral overcharges by a settlement services provider.  *See* HUD

10   Policy Statement 2001-1, 60 Fed. Reg. 53052 (Oct. 18, 2001) ("PS2001-1").  Second, Wells argues

11   that plaintiffs have not alleged that Wells "split" the purported overcharges with any other party, and

12   therefore plaintiffs have not stated a claim under section 8(b).  Plaintiffs argue that deference under

13   *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984) applies, and

14   under PS2001-1, Wells is liable for overcharges even if there are no allegations of a split of fees

15   with a third party.

16        Section 8(b) of RESPA (codified as 12 U.S.C. 2607(b)) provides:

17        § 2607.  Prohibition against kickbacks and unearned fees

18        ***

19        (b) Splitting charges

20        No person shall give and no person shall accept any portion, split, or percentage of
          any charge made or received for the rendering of a real estate settlement service in
21        connection with a transaction involving a federally related mortgage loan other than
          for services actually performed.

22   12 U.S.C. § 2607(b).  The provision of PS2001-1 upon which plaintiffs rely provides that it is a

23   violation of section 8(b) for "one settlement service provider to charge the consumer a fee where no,

24   nominal, or duplicative work is done, or the fee is in excess of the reasonable value of goods or

25   facilities provided or the services actually performed."  66 Fed. Reg. 53052, *available at* 2001 WL

26   1240492.

27

28

ORDER GRANTING MOTION TO DISMISS COUNTS TWO THROUGH SIX OF FIRST AMENDED COMPLAINT
No. C-06-03327 RMW
SPT                                                                 5

United States District Court
For the Northern District of California

1    As explained in *Schuetz v. Banc One Mortg. Corp.*, 292 F.3d 1004, 1008 (9th Cir. 2002),

2    RESPA "sought to increase the supply of information available to mortgage consumers about the

3    cost of home loans in advance of settlement, and to eliminate abusive practices such as kickbacks,

4    referral fees, and unearned fees." *Id.* Although the Ninth Circuit has not considered the issue of

5    whether section 8(b) reaches unilaterally imposed overcharges or mark ups (and the related issue of

6    whether deference should be accorded HUD's interpretation of section 8(b) in PS2001-1), several

7    other circuits have.[4]

8        The Second, Third, Fourth, Seventh, and Eighth Circuits have each found that based on a

9    plain text reading, section 8(b) does not prohibit overcharges.  In *Kruse*, 383 F.3d at 56, the Second

10   Circuit held that "section 8(b) clearly and unambiguously does not extend to overcharges."  The

11   Second Circuit reasoned that the text of section 8(b) indicates that it extends only to charges where

12   no services were performed. *Id.*  Therefore, it concluded that whatever its size, a fee that is "for the

13   services rendered by the institution and received by the borrower, does not violate section 8(b)." *Id.*

14   The court also observed that it would be odd to read the statute as instructing courts to award treble

15   damages without giving the courts "so much as a hint" how to differentiate between reasonable and

16   unreasonable components of a charge for services. *Id.*  Finally, the court noted that the legislative

17   history of RESPA indicates that Congress had declined to enact a bill directing HUD to set

18   regulations limiting the amount of closing costs that may be charged. *Id.* at 56-57.  Thus, the court

19   concluded that because Congress did not intend for RESPA to impose price controls, Congress did

20   not intend for RESPA to cover overcharges, and no deference should be accorded HUD's

21   interpretation that section 8(b) bars overcharges under *Chevron*.

22       Similarly, in *Santiago v. GMAC Mortgage Group, Inc.*, 417 F.3d 384, 387 (3d Cir. 2005), the

23   Third Circuit found that the text of section 8(b), as a whole, "states that no person can accept a

24   fraction of a charge for services provided, unless they have actually provided services."  Like the

25

---

26   [4]    In *Schuetz*, the Ninth Circuit did not address § 8(b) or HUD's interpretations of § 8(b), but
27   addressed only § 8(c)(2) and HUD's regulations pertaining to § 8(c)(2).  Therefore, the Ninth
     Circuit's determination in *Schuetz* that PS2001-1 should be accorded deference was limited only to
28   that regulation's interpretation of § 8(c) of RESPA.  *Schuetz* did not reach HUD's interpretation of §
     8(b) as plaintiffs suggest.

ORDER GRANTING MOTION TO DISMISS COUNTS TWO THROUGH SIX OF FIRST AMENDED COMPLAINT
No. C-06-03327 RMW
SPT

United States District Court
For the Northern District of California

Second Circuit, the Third Circuit found that the text of 8(b) does not support making a distinction between a reasonable and an unreasonable portion of a charge for services performed, no language in the statute provides for making such a distinction, and it would be unusual for Congress to provide for treble damages without also providing for a definition of what constitutes an unreasonable charge. *Id.* The court concluded that because the text of the statute is unambiguous, it need not reach the question of whether PS2001-1 should be accorded deference. *Id.*

The Seventh and Fourth Circuits have held that based on the plain language of the statute, section 8(b) does not apply to overcharges unless "a 'portion' or 'percentage' of that overcharge is kicked back to or 'split' with a third party." *See Boulware v. Crossland Mortg. Corp.*, 291 F.3d 261, 265 (4th Cir. 2002)[5]; *Echevarria v. Chicago Title & Trust Co.*, 256 F.3d 623, 626-28 (7th Cir. 2001). The Seventh Circuit's holding relies primarily on its conclusion that, based on the plain text of the statute, section 8(b) is an anti-kickback provision, not a price control statute. *See Mercado v. Calumet Fed'l Sav. & Loan Ass'n*, 763 F.2d 269, 271 (7th Cir. 1985) (citing 1974 U.S.C.C.A.N. 6549-50) (noting that Congress considered and explicitly rejected a system of price control for fees and concluded that the price of real estate services should be set in the market). Similarly, the Fourth Circuit's holding rests on its determination that "Congress was clearly aiming at a sharing arrangement rather than a unilateral overcharge by its use of the statutory language 'portion, split, or percentage' and 8(b) is not meant to impose price controls. *Boulware*, 291 F.3d at 268, 268.

The Eighth Circuit has adopted the Seventh and Fourth Circuit's holdings regarding overcharges. In *Haug v. Bank of America, N.A.*, 317 F.3d 832, 836 (8th Cir. 2003), the Eighth Circuit held that the statutory text "unambiguously requires at least two parties to share a settlement fee in order to violate the statute."[6]

Here, plaintiffs argue that the holdings of the Second, Third, Fourth, Seventh, and Eighth Circuits are erroneous in that the courts did not properly defer to PS2001-1. Plaintiff argues that

---

[5]    In *Boulware*, the practice at issue is a "mark up" but the court applied its analysis to both mark ups and overcharges.

[6]    The charges at issue in *Haug* consist of what plaintiffs in this action refer to as mark ups but the court's analysis appears to address both mark ups and overcharges.

United States District Court
For the Northern District of California

1    under *Chevron*, courts first determine "whether Congress explicitly delegated interpretative

2    authority to a federal agency" and, "if the authority was delegated, then the court should give

3    deference to the agency interpretation, which is 'binding unless procedurally defective, arbitrary or

4    capricious in substance, or manifestly contrary to the statute.'" Pls.' Opp. at 4:20-28 (citing *U.S. v.*

5    *Mead Corp.*, 533 U.S. 218, 219 (2001)).  It is not disputed that Congress conferred to HUD authority

6    to issue rules, regulations, and interpretations to achieve the purposes of RESPA.  However, under

7    *Chevron*, "[w]hen a court reviews an agency's construction of the statute which it administers," it

8    first must determine "whether Congress has directly spoken to the precise question at issue."  467

9    U.S. at 842. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as

10    the agency, must give effect to the unambiguously expressed intent of Congress."  *Id.* at 842-43.

11    The Second, Third, Fourth, Seventh, and Eighth Circuits concluded that the statutory text was

12    unambiguous as applied to overcharges for services performed.  Because the courts found the

13    statutory text unambiguous as to the issue of overcharges, they did not need to consider PS2001-1.

14        This court likewise finds that the text of section 8(b) is unambiguous and does not extend to

15    overcharges.  In particular, the reasoning applied by the Second and Third Circuits that section 8(b),

16    by its text, applies only where a fee is charged without the performance of any services is

17    persuasive.  Section 8(b)'s prohibition is expressly qualified by the clause "other than for services

18    actually performed."  Although the Ninth Circuit has not ruled on this issue, in *Geraci v. Homestreet*

19    *Bank*, 347 F.3d 749, 751 (9th Cir. 2003), it observed in dicta that section 8(b) "prohibits the payment

20    of any percentage or division of a charge *except for services actually rendered*." (emphasis added).

21    A plain reading of the statutory text does not support the contention that Congress intended section

22    8(b) to serve as a mechanism for private litigants to place a cap on the prices charged by settlement

23    service providers for the services they provide.[7]  RESPA does not provide for any mechanism by

24    which a court could determine what portion of any particular purported overcharge is excessive, nor

25

---

26    [7]     Moreover, although not raised by defendants, 12 U.S.C. § 2607(c)(2) appears to provide a
       safe harbor for fees charged in exchange for services rendered or goods provided:  "Nothing in this
27    section shall be construed as prohibiting . . . (2) the payment to any person of a bona fide salary or
       compensation or other payment for goods or facilities actually furnished or for services actually
28    performed."

United States District Court
For the Northern District of California

1   does it appear Congress delegated to HUD authority to set price limitations on the prices charged by

2   settlement service providers. *See Kruse*, 383 F.3d at 56-57 (citing 119 Cong. Rec. 26,548-49

3   (1973)) (observing that Congress declined to adopt a proposed bill "directing HUD to limit the

4   amount of closing costs which can be charged in each section of the country").  Where the

5   settlement service provider renders the service or provides the goods or facilities and overcharges, it

6   nevertheless has provided a service, good, or facility in exchange for the fee.  Therefore, any

7   argument that an overcharge contains an unearned fee component boils down to a complaint that the

8   settlement service provider's profit is too high, enforcement of which necessarily requires a price

9   control mechanism.  As the circuit courts who have considered section 8(b) in this context have also

10  concluded, section 8(b) is not a price control statute and does not extend to overcharges.

11      Plaintiffs argue that the legislative history supports their position.  This argument is not

12  persuasive as to overcharges.  Plaintiffs point to the congressional intent set forth in RESPA, 12

13  U.S.C. § 2601(a), which states that a purpose of the statute is "to protect consumers . . . from

14  unnecessarily high settlement charges caused by certain abusive practices that have developed in

15  some areas of the country."  However, this stated intent does not indicate that Congress sought for

16  the fees charged by settlement service providers for services they provide to be "controlled" through

17  private litigation (as PS2001-1 appears to suggest).  When Congress elaborated on the specific

18  purposes of RESPA, it did not enumerate price control (or control of overcharges) as one of the

19  purposes.  *See* 12 U.S.C. § 2601(b).  Thus, while Congress could have enacted RESPA to direct a

20  cap on fees that may be charged by settlement service providers, it did not.

21  **C.      Section 17200 Claims**

22      Defendants argue that plaintiffs' § 17200 claims are preempted by the National Bank Act of

23  1864, 12 U.S.C. § 21 *et seq.* and related federal regulations thereunder.  In counts three through five,

24  plaintiffs allege that Wells's conduct constitutes unlawful, unfair, and fraudulent business acts and

25  practices in violation of Cal. Bus. & Prof. Code § 17200 *et seq.*  The court finds that plaintiffs'

26  § 17200 claims are either preempted by the National Bank Act and regulations thereunder or that

27  plaintiffs have otherwise failed to state a § 17200 claim.

28

### 1.    Unfair and Deceptive Business Acts or Practices

Congress expressly authorizes national banks to engage in real estate lending under the National Bank Act:

> (a) Authorization to make real estate loans; orders, rules, and regulations of Comptroller of the Currency
>
> Any national banking association may make, arrange, purchase or sell loans or extensions of credit secured by liens on interests in real estate, subject to section 1828(o) of this title and such restrictions and requirements as the Comptroller of the Currency may prescribe by regulation or order.

12 U.S.C. § 371(a).

Defendants argue there is both field preemption and conflict preemption.  "[A] federal statute implicitly overrides state law either when the scope of a statute indicates that Congress intended federal law to occupy a field exclusively, or when state law is in actual conflict with federal law." *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) (internal citation omitted).  Because of the "extensive federal statutory and regulatory scheme" enacted by Congress in the field of banking, "the usual presumption against federal preemption of state law is inapplicable to federal banking regulation." *Wells Fargo Bank N.A. v. Boutris*, 419 F.3d 949, 956 (9th Cir. 2005).  Nevertheless, under Ninth Circuit law, it does not appear that Congress, through the National Bank Act, intended to "occupy the field." *See id.* at 963 (holding that "states may regulate national banks where 'doing so does not prevent or significantly interfere with the national bank's exercise of its powers'") (quoting *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 33 (1996)).

We turn next to defendants' argument that conflict preemption applies.  The extent of the National Bank Act's regulation depends on both the enumerated and incidental powers conferred upon national banks.  *Id.* (noting that "the history of national banking legislation has been 'one of interpreting grants of both enumerated and incidental 'powers' to national banks as grants of authority not normally limited by, but rather ordinarily pre-empting, contrary state law'") (quoting *Bank of America v. City & County of San Francisco*, 309 F.3d 551, 558 (9th Cir. 2002)).  "[A] national bank's activity is authorized as an incidental power, necessary to carry on the business of banking, within the meaning of 12 U.S.C. § 24, Seventh, if it is convenient or useful in connection with the performance of one of the bank's established activities pursuant to its express powers under

United States District Court
For the Northern District of California

1  the National Bank Act." *Id.* at 960 (citation and internal quotations omitted).[8]  A connection must

2  exist between an incidental activity and an express power in order for the activity to be authorized as

3  an incidental power.  *Id.* (citations omitted).

4       Here, the express power conferred by the National Bank Act is the authority to "engage in

5  real estate lending," including to "make, arrange, purchase or sell loans or extensions of credit

6  secured by liens on interests in real estate."  12 U.S.C. § 371.  Wells argues, and plaintiffs do not

7  dispute, that the determination of interest and non-interest charges and fees are incidental powers to

8  the express power of engaging in real estate lending.  The Office of the Comptroller of the Currency

9  ("OCC") has issued regulations that address national banks' powers to determine interest rates and

10  non-interest charges and fees, including the preemptive effect of such powers, in Title 12 Title,

11  Chapter I, Part 7, Subpart D.[9]

12       Specifically, 12 C.F.R. 7.4002 provides that a national bank "may charge its customers

13  non-interest charges and fees, including deposit account service charges" and that the determination

14  of such charges and fees are "business decisions to be made by each bank, in its discretion,

15  according to sound banking judgment and safe and sound banking principles."  A national bank is

16  deemed to establish such charges and fees in accordance with safe and sound banking principles if

17  "the bank employs a decision-making process through which it considers the following factors:"

18       (i) The cost incurred by the bank in providing the service;

19       (ii) The deterrence of misuse by customers of banking services;

20       (iii) The enhancement of the competitive position of the bank in accordance with the bank's business plan and marketing strategy; and

21       (iv) The maintenance of the safety and soundness of the institution.

22
23  12 C.F.R. § 7.4002(b)(2).  In addition, 12 C.F.R. § 34.4 provides that "a national bank may make

24
25  [8]  More specifically, § 24 addresses corporate powers authorized pursuant to a national bank's corporate form following the filing of its articles of association and organization certificate.

26  [9]  The National Bank Act confers authority upon the OCC to promulgate regulations
27  implementing the Act.  *See* 12 U.S.C. § 371(a) (conferring upon the OCC the authority to set restrictions and requirements for national banks' real estate lending power).  "Federal regulations have no less pre-emptive effect than federal statutes."  *Fidelity Fed. Sav. & Loan Ass'n v. de la*
28  *Cuesta*, 458 U.S. 141, 153 (1982).

real estate loans under 12 U.S.C. 371 and § 34.3, without regard to state law limitations concerning . . . [t]he terms of credit . . . [and] [p]rocessing, origination, servicing, sale or purchase of, or investment or participation in, mortgages."  12 C.F.R. § 34.4(4), 34.4(10).

Plaintiffs do not argue that the fees at issue in this action, namely, underwriting fees, tax service fees, document preparation fees, and other similar settlement services fees related to closing of a mortgage loan, do not fall within the OCC's regulations in 12 C.F.R. § 7.4002 or § 34.4.  *Cf. Chaires v. Chevy Chase Bank, F.S.B.*, 131 Md. App. 64, 87 (2000) (finding that settlement related fees such as tax service fee, documentation fees, underwriting fees, appraisal fees, and courier fees are loan-related fees for a mortgage under a similar Office of Thrift Supervision federal regulation applicable to federal savings and loan institutions).  Likewise, plaintiffs do not argue that the determination and charging of such fees are not incidental powers to a national bank's express power to engage in real estate lending.  Rather, plaintiffs argue that their claims are "consistent with the National Bank Act" because the OCC has "specifically advised banks that they are subject to state consumer protection laws."  Pls.'s Opp. at 16:18-22.  In support, plaintiffs rely on an OCC Advisory Letter issued to the chief executive officers of national banks reminding them of "the risks present in engaging in lending and marketing practices that may constitute unfair or deceptive acts or practices."  Pls.'s Opp. at 16:22-25 (citing OCC Advisory Letter, Guidance on Unfair or Deceptive Acts or Practices Act AL 2002-03, *available at* 2002 WL 521380 *1 (March 22, 2002)).  Thus, plaintiffs argue, the OCC has expressly endorsed UCL liability.

The court does not find that plaintiffs' arguments that there is no conflict preemption persuasive.  Here, plaintiffs' § 17200 claims are premised primarily upon allegations that defendants (1) improperly overcharge or mark up settlement service charges and (2) fail to disclose actual costs pursuant to 24 C.F.R. § 3500.8(b), Appendix A.  *See* FAC ¶¶ 52, 58, 70-72.[10]  The OCC's regulations in section 7.4001 establish that the setting of non-interest fees and charges for real estate loans are business decisions within a national bank's discretion and that such decisions are considered to fall within safe and sound banking principles if the decision considers certain factors.  Here, the fees charged by Wells are not alleged to exceed the authority conferred by the National

---

[10]    Plaintiffs also generally allege that the purportedly excessive charges violate California Financial Code § 5000 *et seq.* without pointing to any specific provisions of that state code.  To the extent plaintiffs allege that the Cal. Fin. Code prohibits fees in excess of actual costs, such state law would be preempted by the National Bank Act and § 7.4002.

1
2
3

Bank Act and the regulations thereunder.[11]  Therefore, to the extent plaintiffs contend that Wells's

conduct nevertheless constitutes unfair or deceptive business practices or acts under § 17200, such

claims are preempted by the National Bank Act and regulation 12 C.F.R. § 7.4002 thereunder.[12]

### 2.   Unlawful Business Practices or Acts

4
5
6
7
8
9
10
11
12
13
14
15

Plaintiffs' claim that defendants' conduct constitutes unlawful business practices and acts is

premised in part on a finding that RESPA bars purported overcharges by Wells.  As discussed

above, plaintiffs have not stated a claim that such alleged overcharges violate RESPA.  Similarly,

plaintiffs have not alleged that Wells has acted unlawfully because it has exceeded its authority

conferred by the National Bank Act or regulations thereunder.  Finally, although plaintiffs allege

that defendants violated HUD regulations at 24 C.F.R. § 3500, App. A, because they did not disclose

"actual costs," the applicable HUD regulation appears to require disclosure only of actual *charges*.

*See* 24 C.F.R. § 3500, App. A ("This form is to be used as a statement of *actual charges and

adjustments* to be given to the parties in connection with the settlement. . . . The settlement agent

shall complete the HUD-1 to *itemize all charges imposed* upon the Borrower and the Seller by the

Lender and all sales commissions, whether to be paid at settlement or outside of settlement, and any

other charges which either the Borrower or the Seller will pay for at settlement.") (emphases added).

Therefore, plaintiffs have not alleged a violation of 24 C.F.R. § 3500, App. A.[13]

16

17
18
19

[11]     For the same reason, plaintiffs' reliance upon *McKell v. Washington Mutual, Inc.*, 142 Cal. App. 4th 1457, 1485 (2006), for the proposition that there is no preemption when the UCL statute is employed to enforce a federal law is unavailing as to its § 17200 claims premised on unfair or deceptive practices and acts.  The excerpt of the *McKell* opinion cited by plaintiffs pertained to a § 17200 claim based on an alleged unlawful business act or practice.  Plaintiffs' § 17200 claim based on unlawful business acts or practices is discussed in subsection C.2, *infra*.

20
21
22
23

[12]     In so holding, the court does not conclude that § 17200 claims are *per se* preempted by the National Bank Act and regulations thereunder.  In their reply, defendants concede that section 17200 claims are not *per se* barred, but are preempted if such claims conflict with the federal law and regulations.  Defs.'s Reply at 8:22-26.  Plaintiffs do not dispute that state laws that "obstruct, impair or condition" provisions of the National Bank Act or its regulations are preempted.  Pls.'s Opp. at 20:12-15.

24
25
26
27
28

[13]     The court notes that in so holding it essentially disagrees with the conclusion of the California Court of Appeals in *McKell* as to a § 17200 claim based on the disclosure of actual charges in a HUD-1 statement.  There, the California court held that a § 17200 claim for fraudulent or deceptive business act or practice was adequately alleged where the plaintiff alleged that the defendant bank failed to disclose actual *costs* in the HUD-1 statement even though the court recognized that federal law only required the HUD-1 statement to disclose actual fees imposed on the buyer and seller.  142 Cal. App. 4th at 1472.  The court concluded that "a reasonable consumer likely would believe that fees charged in connection with a home mortgage loan bore some correlation to services rendered."  *Id.*  Notably, although plaintiffs here cite *McKell*, they do not

United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**D.      Breach of Contract Claim**

In count six, plaintiffs allege that Wells is contractually obligated to comply with, *inter alia*, HUD's regulations implementing RESPA and, because Wells failed to comply with PS2001-1, Wells has breached its contract with plaintiffs.  Defendants seek to dismiss plaintiffs' breach of contract claim on the basis of preemption.  The court does not reach the issue of preemption as to this claim. Plaintiffs' breach of contract claim is premised entirely on its contention that the HUD regulations are specifically incorporated into the Deed of Trust between defendants and plaintiffs based on language in the Deed of Trust, which states: "'RESPA' means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part5 3500 [sic]), as they might be amended from time to time."  FAC ¶ 16 (emphasis in original). Assuming without deciding that the Deed of Trust is a contract between the parties, the court does not find this language to create a contractual obligation to comply with RESPA and its regulations. Further, the court does not find that plaintiffs have alleged a breach of contract claim independent of its allegations in counts one and two that defendants have violated RESPA and regulations established thereunder.  Therefore, plaintiffs' breach of contract claim is dismissed.

**E.      Leave to Amend**

Leave to amend is to be freely granted when justice so requires.  *See* Fed. R. Civ. P. 15(a). Absent prejudice or a strong showing of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by amendment, or futility of amendment, "there exists a presumption under Rule 15(a) in favor of granting leave to amend." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).  Previously, plaintiffs amended their initial complaint after defendants moved to dismiss but prior to the court's hearing and ruling on that motion.  The court finds that leave to amend is proper except as to count two of the complaint, which asserts that overcharges are a violation of section 8(b) of RESPA.

appear to cite it for this proposition.

ORDER GRANTING MOTION TO DISMISS COUNTS TWO THROUGH SIX OF FIRST AMENDED COMPLAINT
No. C-06-03327 RMW
SPT                                                                        14

1

## III.  ORDER

2    For the foregoing reasons, the court GRANTS defendants' motion to dismiss.  Plaintiffs have

3  twenty days from the date of this order to amend their complaint, except as to count two, which is

4  dismissed with prejudice.

5

6  DATED:   ___3/30/07_____        _____

7                                        RONALD M. WHYTE
                                         United States District Judge
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

1

**Notice of this document has been electronically sent to:**

2

**Counsel for Plaintiffs:**

3

Jacquetta Bardacos          jbardacos@packard.com
Ronald D. Packard           rdpackard@packard.com

4

Von G. Packard              vpackard@packard.com
Timothy G. Blood            timb@mwbhl.com

5

6

**Counsel for Defendants:**

7

Robert Bader                rbader@goodwinprocter.com
William F. Sheehan          wsheehan@goodwinprocter.com

8

9

10

11

Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program.

12

13

**Dated:**      3/30/07                              SPT
                                          **Chambers of Judge Whyte**

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER GRANTING MOTION TO DISMISS COUNTS TWO THROUGH SIX OF FIRST AMENDED COMPLAINT
No. C-06-03327 RMW
SPT